**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **RAYMOND BAILEY** | : | **CIVIL ACTION** |
| **Plaintiff,** | : | |
| | : | **NO.  10-1122** |
| **v.** | : | |
| | : | |
| **GREENWICH TERMINALS, LLC,** | : | |
| **Defendant.** | : | |

**DuBOIS, J.**                                                               **January 25, 2012**

<u>**M E M O R A N D U M**</u>

**I.       Introduction**

This is an employment discrimination case.  Plaintiff Raymond Bailey alleges that

defendant Greenwich Terminals, LLC, discriminated against him on the basis of a disability in

violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 <u>et seq</u>.  Presently

before the Court is Defendant's Motion for Summary Judgment.  For the reasons that follow, the

Court grants the motion.

**II.      Background[1]**

**A.  The Parties**

Plaintiff, a male in his mid-fifties, has been a union longshoreman in the Port of

Philadelphia since 1976.  (Statement Material Facts Supp. Def.'s Mot. Summ. J. ("Def. Material

Facts") ¶¶ 6–7.)  Plaintiff originally belonged to International Longshoremen's Association

("ILA") Local 1332, a union for carloader coast-wide longshoremen.  (<u>Id.</u> ¶ 8; Raymond Bailey

Dep. ("Bailey Dep."), Def.'s Mot. Summ. J. Ex. C, at 12.)  Around 1997, Local 1332 merged

---

[1] As required on a motion for summary judgment, the facts set forth in this Memorandum are
presented in the light most favorable to plaintiff, the non-moving party.

into Local 1291, which is the deep sea and marine terminal union.  (Def. Material Facts ¶¶ 6, 8; Bailey Dep. 13.)  The former members of Local 1332 continued to do the same work and were identified as "1291-T," which "indicated the hiring seniority of the 1332 members" compared to 1291 members.  (Def. Material Facts ¶ 9; Bailey Dep. 15.)

Defendant operates the Packer Avenue Marine Terminal, a port in South Philadelphia where container ships load and unload freight.  (Def. Material Facts ¶¶ 2, 5, 17.)  Defendant and other area terminal operators belong to the Ports of the Delaware River Marine Trade Association ("PMTA"), which engages in collective bargaining with the local ILA unions on behalf of the terminal operators.  (Id. ¶ 5.)

**B.  The Terminal List**

Longshoremen obtain jobs of variable length at PMTA terminals, including the Packer Avenue Marine Terminal, through "hires."  (Bailey Dep. 17–22.)  The "hire" process is governed by an intricate set of contractual rules and informal practices.  (Id.)[2]  Some terminals, including the Packer Avenue Marine Terminal, maintain a "terminal list."  (Bailey Dep. 31.) Longshoremen who appear on the terminal list for a given terminal have hiring priority and get work "virtually every day" at that terminal.  (Def. Material Facts ¶ 15; Pl. Answer Opp'n Mot. Summ. J. Def. Greenwich Terminals, LLC ("Pl. Ans.") ¶ 15.)  Although longshoremen can work at different PMTA terminals, they can only be on the terminal list at one terminal. (Bailey Dep. 31.)  Some longshoremen prefer to be on a terminal list because it generally allows them to be

---

[2] The parties disagree on many details of the hiring process, including the appropriate terminology for the steps and rules involved.  (Compare Def. Material Facts ¶ 21 ("The grandfathered Local 1332 members have priority due to their seniority for [Hiring Center] jobs immediately after the terminal list hires.") with Pl. Ans. ¶ 21 ("Denied as stated.  Plaintiff disagrees with the term 'grandfathered' . . . Local 1332 members secured a priority due to a settlement agreement.").)  The disputed details are not material to the issues presently before the Court.

first in line for a hire, to be hired without being physically present at the PMTA/ILA Hiring Center, to preference a specific task assignment within the hire, and to take time off without losing their position on a hire.  (Def. Material Facts ¶¶ 21–22; Pl. Ans. ¶¶ 21–22; Bailey Dep. 36–40.)  Because terminal list employees work consistently on a single terminal's hires, the employer can count on a supply of skilled and experienced workers.  (Bailey Dep. 47–48.) Longshoremen who are not on the terminal list are selected for hires only if there is sufficient work.  (Id. at 29.)  Although the parties dispute whether the Packer Avenue Marine Terminal terminal list "belongs" to defendant or to the terminal itself, they agree that defendant controls the list.  (Id. at 43, Pl. Ans. ¶ 17.)

**C.  Defendant's Terminal List Status at the Packer Avenue Marine Terminal**

In 2006, plaintiff sought a transfer from the terminal list for the Tioga Terminal to the terminal list for the Packer Avenue Marine Terminal. (Bailey Dep. 32.)  Defendant denied the request on the ground that the Packer Avenue list was "frozen."  (Def. Material Facts ¶ 23, Pl. Ans. ¶ 23.)  Local 1291 asked defendant to open the list, and defendant agreed to add plaintiff and another longshoreman to that list if they signed an Employee Agreement.  (Def. Material Facts ¶ 25, Pl. Ans. ¶ 25.)  Plaintiff declined.  (Def. Material Facts ¶ 26.)  Because plaintiff had some seniority as a "1291-T" cardholder, he continued to work at the Packer Avenue Marine Terminal, even though he did not receive the benefits of being on the terminal list.  (Id. ¶ 29.)

On May 22, 2007, after plaintiff refused an assignment, defendant terminated plaintiff "from all future work opportunities" with defendant. (May 24, 2007, Letter from John Burleson ("5/24/07 Burleson Letter"), Def. Mot. Summ. J. Ex. I, at 1.)  Local 1291 filed a grievance on plaintiff's behalf, which the union and defendant settled by adding plaintiff to the terminal list for the Packer Avenue Marine Terminal.  (2007 Settlement Agreement, Def. Mot. Summ. J. Ex.

J, at 3–4.)  As part of the settlement, plaintiff agreed that he would "work the job opportunities available in a manner consistent with other employees on the terminal list" and that he "underst[ood] that failure to do so, unless excused by his foreman, and subject to contractual time off with notice," could be grounds for removal from the terminal list.  (Id. at 4.)

### D.  Injury and Treatment Through January 2009

Plaintiff injured his left shoulder and upper back while driving a top-pick machine[3] at work on August 20, 2008; he was "attempting to avoid an on-coming 18-wheeler [and] . . . struck a container."  (Def. Material Facts ¶ 35, Pl. Ans. ¶ 35.)  Plaintiff, who had "no previous significant shoulder or back problem[s]," experienced pain, a limited range of motion, and "some numbness and tingling."  (8/21/08 Report of Doctor Li, Def.'s Mot. Summ. J. Ex. K, at 1.)  That day, plaintiff saw a doctor who opined that plaintiff could work "light duty" and could "still drive [the top-pick] machine" but should "avoid overhead reaching and repetitive turning of the shoulder joint."  (Id. at 2; 8/21/08 Restriction Evaluation, Def.'s Mot. Summ. J. Ex. L, at 1.)  Plaintiff returned to work but experienced "increased discomfort" while driving the top-pick.  (8/25/08 Report of Doctor Gernerd, Def.'s Mot. Summ. J. Ex. M, at 1.)  On August 25, 2008, plaintiff stopped working and began receiving workers' compensation insurance payments; these payments continued until February 26, 2009.  (10/24/08 Notice of Final Payment, Def.'s Mot. Summ. J. Ex. N, at 1; Def. Material Facts ¶ 50; Pl. Ans. ¶ 50.)[4]

---

[3] The top-pick "is a machine that picks up the containers and unload[s] them from chassis [and] stack[s] them in the yard on top of each other."  (Bailey Dep. 33.)

[4] The Notice of Final Payment on October 24, 2008, states that plaintiff's workers' compensation benefits ceased as of October 20, 2008, because Doctor Arena "released [plaintiff] to return to work with restrictions . . . effective 10/20/08."  (10/24/08 Notice of Final Payment 1.)  However, the parties' filings make clear that plaintiff remained "out of work on workman's compensation insurance" until the February 2009 cessation of benefits that is the basis of plaintiff's ADA claim.  (Def. Material Facts ¶¶ 38, 50; Pl. Ans. ¶¶ 38, 50.)

Plaintiff began treatment with Doctor Mario Arena, an orthopedist, on September 11, 2008.  (9/11/08 Arena Eval., Pl. Ans. Ex. C, at 1.)  Doctor Arena provided copies of all of his evaluations to Sarah Yang, an agent for Lamorte Burns & Co., Inc., defendant's workers' compensation company.  (See, e.g., 9/11/08 Arena Eval., Pl. Ans. Ex. C, at 1.)  From September to late November, 2008, Doctor Arena's evaluations recommended that plaintiff could handle no more than "10 [pounds] with both hands" and could "drive a power steering car or small truck" but not "operat[e] any heavy equipment."  (E.g., 10/2/08 Arena Eval., Pl. Ans. Ex. C, at 2.)  Doctor Arena's notes from this time period show that, on at least two occasions, plaintiff tried to return to work in jobs other than driving the top-pick.  (See 10/22/08 Arena Eval., Pl. Ans. Ex. C, at 1 ("[Plaintiff] returned to work in a restricted capacity and was placed on a sanitation crew and was unable to lift the trashcans.  He therefore was working as a helper for a chock operator putting pieces of wood underneath and removing pieces of wood from the top of cargo containers noting that these could weigh up to 25–30 [pounds] . . .").)  However, when plaintiff returned to work, he irritated his injury and "got complaints from the foreman."  (Id. at 1; 11/20/08 Arena Eval., Pl. Ans. Ex. C, at 1–2; Bailey Dep. 99.)  In his November 20, 2008, evaluation, Doctor Arena requested that Ms. Yang provide "a specific job description to sign off on prior to [plaintiff] returning to any restricted duties."  (11/20/08 Arena Eval., Pl. Ans. Ex. C, at 1–2.)

On December 3, 2008, Doctor John Bednar, a hand specialist, examined plaintiff. (12/9/08 Bednar Letter, Pl. Ans. Ex. B, at 1–4.)  Doctor Bednar concluded that plaintiff suffered from two separate medical conditions: (1) cervical radiculitis in his left shoulder and upper back, which his work accident caused, and (2) carpal tunnel syndrome in his left hand, which existed prior to the accident and was "not causally related" to his work injury.  (Id. at 3.)  On December

17, 2008, having reviewed Doctor Bednar's report, Doctor Arena evaluated plaintiff as "clear for a light level of activity with handling up to 20 [pounds] with no overhead lifting" but no "activities at unprotected heights."  (12/23/08 Arena Eval., Pl. Ans. Ex. C, at 1).  However, Doctor Arena opined that his assessment was "not based on [plaintiff's] hand symptomotology, which [was] unrelated to his work injury."  (Id. at 1.)

Plaintiff "want[ed] to obtain a second opinion on his condition" and, although he wanted to be evaluated by Doctor Roy Lefkoe, he "was set up by his insurance carrier to see Dr. [Stuart] Trager."  (See 1/7/09 Arena Eval., Pl. Ans. Ex. C, at 1; 1/21/09 Arena Eval., Pl. Ans. Ex. C, at 1.)  Doctor Trager, an orthopedist, reviewed plaintiff's medical records and evaluated plaintiff on January 22, 2009.  (2/9/09 Letter from Doctor Trager to Lisa Rich, Pl. Ans. Ex. B, at 1–5.)  Doctor Trager opined that "[plaintiff] should be capable of return to regular duty work" but that it was "reasonable" to limit plaintiff "to use the left upper extremity below shoulder height" to avoid "exacerbat[ing] . . . underlying . . . arthritis and reported symptoms" that were unrelated to the August 20, 2008, injury.  (Id. at 4.)  Specifically, Doctor Trager wrote that defendant's lifting should be restricted to ten to twenty pounds, pushing and pulling only "below shoulder height," and reaching above the shoulder "one handed only (r[ight])."  (1/22/09 Trager Work Restriction Eval., Def. Mot. Summ. J. Ex. P, at 1.)

**E.  Plaintiff Cleared to Return to Work**

On January 23, 2009, Ms. Yang e-mailed Robert Feith, a workers' compensation administrator at Holt Logistics Corporation, a company that managed "many of the administrative aspects of [defendant]."  (Def. Material Facts ¶¶ 39–40; Yang/Feith E-mails, Def.'s Mot. Summ. J. Ex. S, at 2.)  Ms. Yang asked Mr. Feith whether the restrictions Doctor Trager recommended in his January 22, 2009, Work Restriction Evaluation could be

accommodated.  (Yang/Feith E-mails at 2.)  On February 18, 2009, Mr. Feith e-mailed John

Burleson, defendant's general manager, a copy of Doctor Trager's evaluation and asked whether

defendant could accommodate the restrictions.  (Feith/Burleson E-mails, Def.'s Mot. Summ. J.

Ex. R, at 1.)  On the same day, Mr. Burleson responded to Mr. Feith: "Yes.  He should contact

his Foreman, Larry Bonner, and advise him that he is able to return to work as an equipment

operator."  (Id.)  Mr. Feith then e-mailed Ms. Yang a copy of Mr. Burleson's message and added

that he "called Mr. Bailey and spoke with him on the phone to advise him of this.  [Plaintiff] said

he is going to verify this with his doctor, Dr. Arena first and make sure he is able to [return to

work] within these restrictions."  (Yang/Feith E-mails at 1.)

Mr. Feith called plaintiff again on February 24, 2009, and told him that defendant could

accommodate his restrictions and he should report to Larry Bonner "per [John Burleson's]

instructions."  (Activity Log, Def.'s Mot. Summ. J. Ex. T, at 1; Def. Material Facts ¶ 49.)  Ms.

Yang sent plaintiff a letter dated February 24, 2009, stating that Doctor Trager had found

plaintiff "capable to returning to [his] regular work" and that plaintiff's workers' compensation

benefits would terminate on February 26, 2009.  (2/24/09 Yang Letter, Def.'s Mot. Summ. J. Ex.

U, at 1.)

### F.  Plaintiff's Failure to Return to Work and Removal from Terminal List

Plaintiff did not return to work in February or March 2009.  As a result, defendant sent

plaintiff a letter signed by John Burleson and dated March 23, 2009, stating that it was removing

plaintiff from the terminal list because he had "refused to return to work" in violation of the

September 11, 2007, settlement agreement, which required plaintiff to "work available job

opportunities."  (3/23/09 Burleson Letter, Def.'s Mot. Summ. J. Ex. V, at 1.)

Plaintiff did not go back to work after the clearance.  He acknowledged that, "[b]ased on the Workmen's Comp[ensation] conversation," he "had been advised that [he was] cleared to go back to work without any restrictions" prior to March 23, 2009.  (Bailey Dep. 96.)  However, on March 18, 2009, plaintiff was evaluated by Doctor Roy Lefkoe, an orthopedist selected by plaintiff who was not affiliated with defendant's workers' compensation insurer, and Doctor Lefkoe opined that "[a]s of [March 18, 2009, plaintiff] was disabled with respect to his usual position as a longshoreman."  (5/6/09 Letter from Doctor Lefkoe, Pl. Ans. Ex. A, at 1–4.)  In plaintiff's view, defendant "went by what Doctor Arena said," but plaintiff felt that he did not have to report because "Doctor Lefkoe . . . had [plaintiff] out on total unable to work."  (Bailey Dep. 97.)

According to plaintiff, defendant knew why he was not showing up to work because he communicated his position to three persons.  First, plaintiff spoke by telephone with his foreman, Mr. Bonner, to "give him an update . . . that [plaintiff] was still under doctor's care" and that "at that particular time [plaintiff] was out of work due to [his] injury and it was not due to anything else."  (Id. at 83, 94–95.)  Plaintiff, however, was "not sure of the dates and times" of the conversation.  (Id. at 95.)  When asked at his deposition whether he told Mr. Bonner to "communicate to Greenwich Terminals that [plaintiff] was unavailable for work," plaintiff stated: "I don't think I did, but I noted in my mind his regular process."  (Id. at 95.)  Second, plaintiff told Ms. Yang on an unspecified date "that Doctor Lefkoe had had [plaintiff] out of work."  (Id. at 97.)  Third, plaintiff twice informed "someone at the company"—someone whose name started with an "F," who "might be" Robert Feith—that he was still seeing Doctor Lefkoe.  (Id. at 98–100.)

Plaintiff explained at his deposition that he did not go to work and say he was "available to work with restrictions" because:

> I had had problems with the time that I went back to work and I was working with one arm trying to do a job that they had me on that I couldn't do. And I got complaints from the foreman. And that history and that experience led me to try to get an understanding of exactly what I'll be doing.
>
> With Doctor Arena, and I know there's some note, Doctor Arena had me on restricted duty. And I never knew what job I would be doing. And I would get the work and I would end up doing a job that would put me in more pain and hurt that I couldn't do.
>
> So I wasn't sure, but I knew Doctor Lefkoe had had me, at that point in time, Doctor Lefkoe had had me out on total unable to work.

(Id. at 99.)

At some time around June 15, 2009, plaintiff returned to work and took "small jobs." (7/21/09 Lefkoe Progress Notes, Pl. Ans. Ex. A, at 1.) Plaintiff began to work "without restrictions" around the beginning of July 2009. (Bailey Dep. 107.) Since plaintiff's return, Mr. Burleson has not had any complaints about him, including his "skill level" and "productivity." (John Burleson Dep., Def.'s Mot. Summ. J. Ex. G, at 65.) Doctor Lefkoe opined, however, that as of October 8, 2009, plaintiff was still "partially disabled and . . . restricted from overhead work, any repetitive movements, or lifting more than 20 pounds." (10/8/09 Lefkoe Progress Notes, Pl. Ans. Ex. A, at 1.)

**G.  Plaintiff's Grievance, NLRB Ruling, and EEOC Complaint**

Local 1291 filed a grievance with PMTA on plaintiff's behalf on April 3, 2009, alleging that removing plaintiff from the terminal list was improper because plaintiff was "still disabled." (4/3/09 Letter from John Lafferty, Def.'s Mot. Summ. J. Ex. X, at 1.) The grievance was never resolved; according to plaintiff, "the union and the PMTA agreed to place the grievance in

abeyance [and] once the workers' compensation issues were resolved, [plaintiff] would be put

back on the terminal list." (Pl. Ans. ¶ 64; Bailey Dep. 87–88.) Although the workers'

compensation case eventually settled, no one took further action with respect to the grievance.

(Bailey Dep. 86–88.)

Plaintiff filed a charge with the National Labor Relations Board ("NLRB") on June 17,

2009, averring that his removal from the terminal list was an unfair labor practice under Section

8(a)(3) of the National Labor Relations Act, 29 U.S.C. § 151 et seq. (NLRB Docket, Def.'s Mot.

Summ. J. Ex. Y, at 1.) The NLRB did not issue a complaint and administratively "deferred" the

case for arbitration because "the dispute concerning the Employer's allegedly discriminatory

removal of [plaintiff] from [the terminal list] appear[ed] to be encompassed by the grievance

procedure of the collective bargaining agreement between [defendant] and its Agent, Holt

Logistics, and [plaintiff]." (8/20/09 NLRB Letter, Def.'s Mot. Summ. J. Ex. B, at 1.)

Plaintiff filed a complaint with the Equal Employment Opportunity Commission

("EEOC") and Pennsylvania Human Relations Commission ("PHRC") in July 2009 alleging,

inter alia, disability discrimination. (EEOC Documentation, Def.'s Mot. Summ. J. Ex. Z, at 1–

7.) The EEOC issued a right-to-sue letter on December 14, 2009, (id. at 7), and plaintiff filed his

Complaint in this case on March 15, 2009.

## H.  Parties' Arguments

Defendant argues that it is entitled to summary judgment for two reasons. First, plaintiff

failed to exhaust his administrative remedies because he did not complete the grievance and

arbitration process set forth in the CBAs between PMTA and the ILA local unions. (Def.'s Mot.

Summ. J. 14–17.) Second, defendant had a legitimate non-discriminatory reason for removing

plaintiff from the terminal list: plaintiff violated the September 11, 2007, Settlement Agreement by failing to report to work after being medically cleared.  (Id. at 19–23)

Plaintiff responds that he exhausted his administrative remedies by filing an EEOC complaint and his failure to complete the grievance and arbitration process does not bar his claim.  (Pl.'s Mem. L. Supp. Pl.'s Ans. ("Pl.'s Mem.") 3–7.)  Plaintiff further asserts that there are genuine issues of material fact as to whether defendant removed him from the terminal list because of his physical disability since he communicated his inability to return to work after receiving Doctor Lefkoe's evaluation.  (Id. at 7–11.)  According to plaintiff, the circumstances of his removal permit an inference of discrimination: when he tried to return to work in the fall of 2008 to do what defendant "characterized as 'modified duty,'" his foreman complained about his performance.  (Id. at 7, 10.)

## III.    Legal Standard

In considering a motion for summary judgment, "the court is required to examine the evidence of record in the light most favorable to the party opposing summary judgment, and resolve all reasonable inferences in that party's favor."  Wishkin v. Potter, 476 F.3d 180, 184 (3d Cir. 2007).  The party opposing the motion, however, cannot "rely merely upon bare assertions, conclusory allegations or suspicions" to support its claim.  Fireman's Ins. Co. v. DuFresne, 676 F.2d 965, 969 (3d Cir. 1982).  After examining the evidence of record, a court should grant summary judgment if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); accord Celotex Corp. v. Catrett, 477 U.S. 317, 322–23 (1986).

A factual dispute is material when it "might affect the outcome of the suit under the governing law" and genuine when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'"  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (citation omitted).

## IV.    Discussion

Defendant's first argument is that the Court "does not have jurisdiction" over plaintiff's ADA claim.  (Def.'s Mot. Summ. J. 14–17.)[5]  Specifically, defendant contends that plaintiff was subject to a collective bargaining agreement that "sets forth specific language prohibiting discrimination" and plaintiff failed to exhaust the grievance and arbitration procedure established to resolve disputes between union members and defendant.  Because the Court concludes that defendant is entitled to summary judgment on the issue of whether defendant's non-discriminatory reason for removing plaintiff from the terminal list was pretextual, the Court does not rule on this issue—the alleged bar for failure to complete the grievance process—and proceeds to the merits of defendant's ADA claim.

The ADA provides that "[n]o covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment."  42 U.S.C. § 12112(a).  Courts apply the familiar burden-shifting framework of McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802–05 (1973),

---

[5] Defendant frames this issue as affecting the Court's "jurisdiction," but "failure to exhaust administrative remedies is not a jurisdictional bar;" instead, it is an affirmative defense that must be pled.  See Smith v. Pallman, 420 F. App'x 208, 212 n.8 (3d Cir. 2011) (citing, inter alia, Wilson v. MVM, Inc., 475 F.3d 166, 174 (3d Cir. 2007)).

to discrimination claims under the ADA.  See, e.g., Parker v. Verizon Pa., Inc., 309 F. App'x

551, 555 (3d Cir. 2009).  Under this framework, "[o]nce a plaintiff establishes a prima facie case,

the burden shifts to the employer to articulate a legitimate, non-discriminatory reason for the

adverse employment action.  The plaintiff then bears the burden of establishing that this

proffered reason is a pretext for discrimination."  Stouch v. Twp. of Irvington, 354 F. App'x 660,

666 (3d Cir. 2009) (citing McDonnell Douglas, 411 U.S. at 802–05).

### 1.   Plaintiff's Prima Facie Case of Discrimination

At the first stage of the McDonnell Douglas framework, plaintiff has the burden of

proving a prima face case of discrimination by a preponderance of the evidence.  411 U.S. at

802.  "To make out a prima facie case of disability discrimination under the ADA, [plaintiff]

must establish that [he] (1) has a 'disability,' (2) is a 'qualified individual,' and (3) has suffered

an adverse employment action because of that disability."  Turner v. Hershey Chocolate USA,

440 F.3d 604, 611 (3d Cir. 2006) (citations omitted).

Defendant does not argue that plaintiff has not established a prima facie case.

Defendant's only argument on the merits of plaintiff's ADA claim is that "the removal of

Plaintiff from the terminal list was not based on any discriminatory reason" but was based solely

on his failure to return to work.  (Def.'s Mot. Summ. J. 19.)  Accordingly, the Court will assume

that plaintiff has established a prima facie case and proceed to the next step of the McDonnell

Douglas framework.

### 2.   Defendant's Legitimate, Non-discriminatory Reason

Defendant's proffered non-discriminatory reason for removing plaintiff from the terminal

list is that plaintiff "violat[ed] the conditions of the 2007 Settlement Agreement [that] placed him

on the terminal list." (Def.'s Mot. Summ. J. 19, 22.)  Once cleared to return to work by Doctors

Arena and Trager, according to defendant, plaintiff "simply never called and never showed up to work." (Id.)  This satisfies defendant's "relatively light" burden to "introduc[e] evidence which, taken as true, would permit the conclusion that there was a non-discriminatory reason for the unfavorable employment decision." See Tomasso v. Boeing Co., 445 F.3d 702, 706 (3d Cir. 2006) (citing Fuentes v. Perskie, 32 F.3d 759 (3d Cir. 1994)).

### 3.   Legitimate Reason as a Pretext for Discrimination

At the third step of the McDonnell Douglas framework, plaintiff must show that the employer's proffered legitimate, non-discriminatory reason for the adverse employment action is pretext for discrimination.  Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 252 (1981). Plaintiff must present "some evidence . . . from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." Fuentes, 32 F.3d at 764; see also St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 515 (1993).  "Put another way, to avoid summary judgment, the plaintiff's evidence rebutting the employer's proffered legitimate reasons must allow a fact-finder reasonably to infer that each of the employer's proffered non-discriminatory reasons was either a post hoc fabrication or otherwise did not actually motivate the employment action . . . ."  Doe v. C.A.R.S. Prot. Plus, Inc., 527 F.3d 358, 370 (3d Cir. 2008).

The first means of showing pretext requires a plaintiff to "demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its actions that a reasonable factfinder could rationally find them unworthy of credence." Keller v. Orix Credit Alliance, Inc., 130 F.3d 1101, 1109 (3d Cir. 1997) (quoting Fuentes, 32 F.3d at 765).  Since the analysis focuses on whether "discriminatory animus"

motivated the employer, it is insufficient to show that the employer's decision was "wrong or

mistaken." Jones v. Sch. Dist. of Phila., 198 F.3d 403, 413 (3d Cir. 1999); see also Coulton v.

Univ. of Pa., 237 F. App'x 741, 747 (3d Cir. 2007).  Rather, to prove pretext, a plaintiff must

demonstrate that "the employer's articulated reason was . . . so plainly wrong that it cannot have

been the employer's real reason." Jones, 198 F.3d at 413 (internal quotations omitted).  The

second way to establish pretext is by "point[ing] to evidence with sufficient probative force" as

to lead a factfinder to conclude "that the employer has previously discriminated against

[plaintiff], that the employer has discriminated against other persons within the plaintiff's

protected class or within another protected class, or that the employer has treated more favorably

similarly situated persons not within the protected class." Simpson v. Kay Jewelers, 142 F.3d

639, 644–45 (3d Cir. 1998).

     The record strongly supports defendant's proffered non-discriminatory reason for

removing plaintiff from the terminal list.  Defendant has consistently stated that it removed

plaintiff from the terminal list on March 23, 2009, because he violated the 2007 Settlement

Agreement.  (3/23/09 Burleson Letter 1; see also John Burleson Dep., Def.'s Mot. Summ. J. Ex.

G, at 22 ("As stated in the letter, he was told that he was released, available to come to work, and

did not come back to work, did not work available work opportunities as per the settlement

agreement.").)  In the 2007 Settlement Agreement, plaintiff agreed to "work the job opportunities

available in a manner consistent with other employees on the terminal list."  (Settlement 4.)

Plaintiff acknowledged that "failure to do so, unless excused by his foreman, and subject to

contractual time off with notice," could be grounds for removal from the terminal list.  (Id.)

Plaintiff admits that he "had been advised that [he was] cleared to go back to work without any

restrictions" prior to March 23, 2009, (Bailey Dep. 96–97), that he knew that failing to work

available opportunities could result in removal from the terminal list, (id. at 80), and that he did
not return to work, (id. at 99–100).

Plaintiff explains that he believed he did not have to report because of Doctor Lefkoe's
opinion. (Id.) He contends that summary judgment for defendant is inappropriate because he
"did communicate his inability to return to work to Sarah Yang, Robert Feith, and Larry Bonner"
and "did attempt to return to work under what Greenwich Terminals characterized as 'modified
duty' and was unable to physically do so." (Pl.'s Mem. 10 (emphasis in original).) Neither of
these arguments, however, truly addresses the issue before the Court: whether a discriminatory
animus motivated defendant to remove plaintiff from the terminal list. See Jones, 198 F.3d at
413.

First, defendant's reliance on Doctor Lefkoe's opinion is misplaced.[6]  Plaintiff's
disagreement with the opinions of Doctors Arena and Trager does not establish that defendant
removed him from the terminal list because of his disability.  The proper venue for resolving the
dispute about plaintiff's medical condition was a workers' compensation claim, which plaintiff
pursued separately and ultimately settled.  (See Pl. Ans. ¶ 50.)  Defendant's workers'
compensation insurer did not terminate plaintiff's benefits until after getting a second medical
opinion and confirming that defendant could accommodate plaintiff's restrictions; plaintiff does
not contest that defendant communicated all of these facts to him.  (Yang/Feith E-mails 1; Bailey
Dep. 96 ("Q. Were you aware, at any time prior to March 23, 2009, that [defendant] had been

---

[6] Plaintiff claims that "Dr. Lefkoe had [him] out on total unable to work," (Bailey Dep. 99),
relying on Doctor Lefkoe's statement that "he was disabled with respect to his usual position as a
longshoreman," (5/6/09 Letter 3).  Read as a whole, though, Doctor Lefkoe's opinion was that
plaintiff could not operate a top-pick, not that he had to stay home from work.  (See id. at 3
(stating that plaintiff "remained disabled with respect to his full duties of a longshoreman" and
that he "remains disabled with respect to his job as a top-pick operator") (emphasis added).)
This opinion is consistent with those of Doctors Trager and Arena, who both recommended that
defendant have some restrictions when he returned to work.

advised that you were cleared to go back to work without any restrictions? A. Based on the

Workmen's Comp conversation, yes.").)  Even if plaintiff did notify Ms. Yang, Mr. Bonner, and

Mr. Feith that he was disputing the cessation of benefits, plaintiff has cited no authority—nor is

the Court aware of any—for the proposition that he was entitled to remain out of work while he

obtained a third medical opinion at his own expense or that such a dispute establishes an

inference of disability discrimination.  Moreover, the fact that plaintiff did not see Doctor Lefkoe

until March 18, 2009—at least three weeks after the termination of his workers' compensation

benefits—undermines any probative value of plaintiff's contention that he was justified in

staying home from work.  (5/6/09 Letter from Doctor Lefkoe 1.)

       Second, plaintiff's contention that he "did attempt to return to work under what

Greenwich Terminals characterized as 'modified duty' and was unable to physically do so,"

(Pl.'s Mem. 10 (emphasis in original)), does not create a genuine issue of material fact as to

pretext.  Plaintiff relies on his statement that he "got complaints from the foreman" when he tried

to work on a sanitation crew or as a chock operator helper in October or November 2008.

(Bailey Dep. 99.)[7]  These times that he returned to work, however, occurred months before

Doctors Arena and Trager cleared plaintiff to return to work in February 2009.  During the

intervening months, plaintiff still had discomfort but "[felt] that he [was] gradually improving his

strength."  (1/7/09 Arena Eval. 1.)  Crucially, once he was cleared for work, plaintiff never

attempted to work in the "equipment operator" position that defendant offered him as an

accommodation; instead, plaintiff assumed he "would get the work and . . . would end up doing a

job that would put [him] in more pain and hurt."  (Bailey Dep. 99.)  After additional months of

treatment, two medical opinions to the contrary, and assurances that defendant could

---

[7] Although the Court views the evidence in the light most favorable to plaintiff, Mr. Burleson
testified that on one of these occasions plaintiff "was there for about ten minutes, barely did
anything, and said he couldn't do the job."  (Burleson Dep. 58.)

accommodate his restrictions, plaintiff's assumption that he would be unable to do any job is insufficient to establish disability discrimination.  See Podobnik v. U.S. Postal Serv., 409 F.3d 584, 594 (3d Cir. 2005) (stating that the party opposing summary judgment "must present more than just bare assertions, conclusory allegations or suspicions to show the existence of a genuine issue") (internal citations omitted).

Plaintiff has also failed to present any evidence "that the employer has previously discriminated against h[im], that the employer has discriminated against other persons within the plaintiff's protected class or within another protected class, or that the employer has treated more favorably similarly situated persons not within the protected class."  See Simpson, 142 F.3d at 644–45.  To the contrary, the circumstantial evidence weighs in defendant's favor.  Instead of forever cutting ties with plaintiff, defendant expressly invited plaintiff "to report to the Hiring Center for daily job opportunities" at the same time it removed plaintiff from the terminal list. (3/23/09 Burleson Letter 1.)  This statement supports defendant's contention that it believed it could accommodate plaintiff's restrictions but could no longer depend on plaintiff to be on the terminal list to work jobs on a regular basis.  Plaintiff's claim is also undercut by the fact that he returned to work and was able to take "small jobs" as of June 15, 2009, and worked "without restrictions" in July 2009, (see 6/9/09 Lefkoe Progress Notes 1; Bailey Dep. 107), even though Doctor Lefkoe opined that plaintiff remained "partially disabled" into October 2009 (10/08/09 Lefkoe Progress Notes 1.)  In addition, since plaintiff returned to work, defendant has had no complaints about plaintiff's "productivity" or "skill level."  (Burleson Dep. 65.)

Other courts have rejected arguments like plaintiff's and granted summary judgment to defendant-employers in similar cases.  In a case involving very similar facts, Wiley v. Ozarks Medical Center, a court granted summary judgment to an employer where the employer

terminated the employee for failure to return after a medical leave of absence for surgery.  No.
08-3347-CV-S-RED, 2009 WL 4114387, at *4–5 (W.D. Mo. Nov. 24, 2009).  The Wiley court
rejected the employee's argument that the failure-to-return rationale was pretextual, given that
the employee "did not keep in regular contact with [her supervisor], did not comply with
department call-in procedures, and did not timely return from her leave of absence."  Id.  The
court also disagreed with the employee's contention that she could not return to work until she
saw an additional doctor, noting that the employee had not called to set up an appointment until
nine days after the date her surgeon told her she was supposed to return to work.  Id.; see also
Spak v. MetLife, No. 3:CV-06-152, 2008 WL 4671800, at *6–7 (M.D. Pa. Oct. 20, 2008)
(granting summary judgment to an employer on a disability discrimination claim when the
employer terminated an employee who neither returned to work nor responded when an
employer discontinued his short-term disability benefits).

    Viewing the evidence in the light most favorable to plaintiff, plaintiff has failed to meet
his burden to offer "evidence rebutting the employer's proffered legitimate reasons [that would]
allow a fact-finder reasonably to infer that each of the employer's proffered non-discriminatory
reasons was either a post hoc fabrication or otherwise did not actually motivate the employment
action . . . ."  See C.A.R.S. Prot. Plus, Inc., 527 F.3d at 370.  Plaintiff has not shown that a
genuine issue of material fact exists as to whether defendant's proffered reason for removing him
from the terminal list, that he failed to report to work after being medically cleared, was pretext
for disability discrimination.

## V.    Conclusion

    The Court concludes that there is no genuine issue of material fact as to whether
defendant's legitimate, non-discriminatory reason for terminating plaintiff was pretext for

disability discrimination.  The Court therefore grants Defendant's Motion for Summary

Judgment.

An appropriate Order follows.